**UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TEXAS**
**AUSTIN DIVISION**

| | | |
|---|---|---|
| **KRISTI KAY MONEY AND ROLF JACOB**<br>**SRAUBHARR**<br>　　　　**Plaintiffs,**<br><br>　　**vs.**<br><br>**CITY OF SAN MARCOS AND DIRECTOR**<br>**OF PLANNING AND DEVELOPMENT**<br>**SERVICES AMANDA HERNANDEZ in her**<br>**official capacity**<br>　　　　**Defendants.** | §<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§<br>§ | **CASE NO. 1:23-CV-718-RP** |

**DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**

TO THE HONORABLE JUDGE OF THE DISTRICT COURT:

NOW COME Defendants City of San Marcos and Amanda Hernandez, Director of Planning and Development Services in her official capacity, by and through counsel of record, to file this Motion for Summary Judgment pursuant to Rule 56, and would respectfully show as follows:

**I.**
**BACKGROUND AND SUMMARY**

**A.　　Background.**

Plaintiffs purchased a house in the Burleson Historic District in 2017, more than a decade after the District was designated in 2005.  Under the San Marcos Development Code, property owners must secure permission from the San Marcos Historic Preservation Commission before making certain alterations to their property, including alterations to the front façade.  In 2023, six years after purchasing the property, Plaintiffs filed an application to remove a wrought-iron Juliette balcony with a letter "Z" attached to it, an apparently original balcony and letter made a part of the house by the original owner, Frank Zimmerman.  A hearing was held, and the Commission denied the application. Plaintiffs never mentioned Zimmerman's now-alleged association with the Ku Klux Klan.

Plaintiffs assert a *per se* physical takings claim in violation of the U.S. Constitution. Plaintiffs also allege an unconstitutional exercise of the police power under Article I, Section 19 of the Texas Constitution. [Doc. 1, ¶¶ 44-62].[1] Plaintiffs do not allege a regulatory taking, nor do Plaintiffs assert in their Complaint that the ordinance is unduly burdensome.

**B.      Summary of the grounds supporting summary judgment.**

Defendants are entitled to summary judgment because:

1.      Plaintiffs' *per se* federal taking claim fails because, as a matter of law, the denial of the COA was not a physical taking like that of the *Loretto* case. *Loretto* is a "very narrow" opinion that is not applicable to this matter;

2.      Plaintiffs' state law taking claim fails because, as a matter of law, neither the Ordinance nor the determination of the Commission were based purely on aesthetics. Instead, the summary judgment evidence shows that the Ordinance dictates and the Commission considered numerous legitimate factors, including historic, architectural, and design elements; and

3.      Plaintiffs' state law taking claim fails because, as a matter of law, the Ordinance as applied was not unduly burdensome.

**II.**
**SUMMARY JUDGMENT EVIDENCE**

**A.      The regulations governing the Burleson Historic District.**

Per the provisions of the San Marcos Development Code, Plaintiffs were required to seek a Certificate of Appropriateness ("COA") from the San Marcos Historic Preservation Commission ("Commission") to make certain alterations to the front façade. [Doc. 37, Plaintiffs' Exhibit 1, § 2.5.5.1(B), P. 62/105]. The San Marcos Development Code section 2.5.5.1(A) states:

> **Purpose.** The purpose of a certificate of appropriateness is to assure that construction, alteration, restoration, relocation, or demolition of a structure, or alterations to the site or appurtenances in a Historic District or a Historic Landmark is congruous with the **historical, architectural or cultural aspects of the district** or landmark. Furthermore, the purpose of a certificate of appropriateness is to make certain that historic structures, streets and neighborhoods are **preserved and protected**.

---

[1] This Court is familiar with the procedural history, thus, for judicial economy, this motion will not address it.

*Id.* (§ 2.5.5.1(A) (bold and underlined emphasis added).

The Commission is directed to consider the following factors when reviewing a COA:

A. Consideration of the effect of the activity on historical, architectural or cultural character of the Historic District or Historic Landmark;
B. For Historic Districts, compliance with the Historic District regulations;
C. Whether the property owner would suffer extreme hardship, not including loss of profit, unless the certificate of appropriateness is issued; and
D. The construction and repair standards and guidelines cited in Section 4.5.2.1.

*Id.* (§ 2.5.5.4), P. 64/105).

Designation criteria for Historic Districts are required to meet at least three (3) of the criteria set forth in the Ordinance.  The criteria include, among others:

visible or archeological reminders of the cultural heritage of the community;

identification with persons who significantly contributed to the development of the community, county, state, or nation;

embodiment of distinguishing characteristics of an architectural style, valuable for the study of a period, type, method of construction, or use of indigenous materials;

unique location or singular physical characteristics that make it an establish or familiar visual feather;

historical, architectural, or cultural integrity of location, design, materials, and workmanship; character as a geographically definable area possessing a significant concentration, linkage, or continuity of historically, architecturally or culturally significant sites, buildings, objects or structures;

character as a geographically definable area possessing a significant concentration, linkage, or continuity of historically, architecturally or culturally significant sites, buildings, objects or structures united by past events or aesthetically by plan or physical development;

character as an established and geographically definable neighborhood, united by culture, architectural style or physical plan and development;

distinctive character, interest or value; strongly exemplifies the cultural, economic, social, ethnic or historical heritage of San Marcos, Texas;

important and significant relationship to other distinctive structures, sites, or areas, either as an important collection of properties or architectural style or craftsmanship or by contributing to the overall character of the area according to the plan based on architectural, historic or cultural motif;

representation as a resource, whether natural or manmade, which greatly contributes to the character or image of a defined neighborhood or community area.

*Id*. (§ 2.5.4.5(B)(1-16), P. 60/105).

Construction or alteration in the Historic District are required to comply with section 4.5.2.1(I)(1)(a)-(j), setting forth detailed factors, including height requirements, proportion of the front Façade, openings, rhythm of solids to voids in front Façades, spacing, relationship of materials, texture and color, roof shapes, walls, and scale of the buildings. *Id*. (§ 4.5.2.1(I)(1)(a-j), P. 90-91/105).

Moreover, the Commission "may use as general guidelines, in addition to the specific guidelines contained in this section, the Historic District Guidelines located in Appendix C of the San Marcos Design Manual, and the current Standards for Historic Preservation Projects issued by the United States Secretary of the Interior." *Id*. (§ 4.5.2.1(I)(2), P. 91/105). These considerations are for the purpose of accomplishing the purpose of the Historic District: promoting public and City educational, cultural and economic welfare and preserving historic neighborhoods as visible reminders of the City's heritage. *Id*. (§ 4.5.2.1(A), P. 87/105).

Appendix C of the Design Manual provides that the guidelines "are intended to preserve and maintain the character of the historic buildings in San Marcos." *Exhibit B,* SAN MARCOS DESIGN MAN. Division 1 § C.1(A). The manual "should help to preserve the integrity of historic buildings and enhance the value of the Historic Districts for both the private investor, residents and owners, and the community as a whole . . . Modifications affect the block as a whole and should have the broad interest of the community in mind." *Id*., § C.1(B). Regarding residential homes, the manual provides that persons should "weigh the safety and comfort concerns with that of historical accuracy, economic feasibility and long term impact." *Id.*, § C.3.2.6(B).

The Secretary of the Interior's guidelines the Ordinance and Commission rely on are located at 36 C.F.R. §67.7(b). These standards involve aesthetic considerations such that the "historic character of a property shall be retained and preserved . . . removal of historic materials or alteration of features and spaces that characterize a property shall be avoided." *Id*., § 67.7(b)(2). The property "shall be recognized as a physical record of its time, place, and use." *Id*., § 67.7(b)(3). "Changes that create a

false sense of historical development . . . shall not be undertaken." *Id*. Changes that have acquired

historic significance "shall be retained and preserved." *Id*., § 67.7(b)(4). Finally, distinctive features

that "characterize a historic property shall be preserved." *Id*., § 67.7(b)(5).

These guidelines do not turn on aesthetic considerations related to whether something is

attractive or pleasing—they relate to preserving a prior time's cultural and historical character, the

expressed purpose of the creation of the Historic District.

**B.    The consideration and grounds for denying Plaintiffs' COA.**

Plaintiffs now claim they wanted to remove the "Z" because of what it symbolizes, but their

application was for removal of the entire Juliett balcony, not merely the "Z." [Doc. 15-1, P. 5].

Regarding the reason for request, Plaintiff Money made a vague reference to "values" and confirmed

that there were "no safety concerns." *Id*., 56:10. Plaintiff Money noted that "every person is different

and we don't like it, we don't want it on, and I think our application speaks for itself." *Id*., 59:20. She

again noted that they wanted it to be similar to "our family's values," but offered no further details as

to what she meant. *Id*., 59:54.

Plaintiffs assert the COA was denied based on "vague appeals to the removal's effect on

character of the home." But the undisputed evidence reflects otherwise. During the meeting, it was

noted the "Z" likely referred to the Zimmerman family who built the home in the 1903's and could

have historical value. *Id*., 54:15. It was further noted that the "whole point of the historic district is to

retain character defining features," including character defining features of the house, and to "respect

the past." *Id*., 59:47.

Commissioner Baker noted the house was "very important historically" since it was the

Zimmerman house. *Id.*, 58:25. Further, the "reason we have houses in the Historic District is we are

trying to make a connection in some ways to the past and to just go in and destroy the one thing that

really pints it out as being the Zimmerman house seems like it would be a shame to take it off . . . it certainly helps to define the house and helps to define the history." *Id.*, 58:48.

Commissioner Dedek noted "that's the whole point of the historic district is to retain character-defining features and that [balcony] is a character-defining feature.  Certainly, it appears to date from the 30's . . . it doesn't seem to cause any problems.  It's relatively minor in its function.  I don't see it's hurting anything and can't see how it could be hurting anything so I don't see a justification for removing it given the fact that the house is in a historic district and that's a character-defining feature of the house." *Id.*, 60:17.

Commissioner Baker further noted that "so many of us who restore these houses struggle to keep the original character-defining aspects of the house and the materials that are originally used . . . and the whole point of being a historic district is to kind of like respect the past." *Id.*, 60:59.

Plaintiffs' previous assertion that the City Attorney has reminded the Commission that it may not consider other factors beyond aesthetics is a misstatement. The City Attorney comment was in the context of a distinction from general zoning requirements: "It's really about the aesthetics the commission approves versus impervious cover and whatnot . . . that would be city code." *See* Plaintiffs' Exhibit 5, 26:30. This is not the equivalent of saying that other factors may not be considered and, in any event, is contradicted by what the Ordinance and the hearing discussion reflects that the Commission should and did consider.

## C.    Frank Zimmerman's ties and contributions to San Marcos.

Although Plaintiffs claim Frank Zimmerman had "undisputed ties to the Ku Klux Klan," or "KKK," and that he "was known to have promoted Ku Klux Klan films and activities at his theatre," the only alleged evidence is a single news article reflecting that his theater exhibited a single movie about the KKK at the State Fair in Dallas (the article also refers to Zimmerman as a "celebrated civic leader" with a bronze plaque across from the courthouse which honors him).  [Doc. 4-2].

While support of the KKK is reprehensible, it is also true that Frank Zimmerman did much for the community and history of San Marcos. Zimmerman was elected Mayor of San Marcos in 1949. *See Exhibit C*, P. 5 ("History of the LBJ Museum Building"). The article notes that Zimmerman and his friend Lyndon Baines Johnson "could often be seen sitting on the curb in front of the theater discussing politics." *Id*., P. 16. He also "led an enormously successful war bond drive through his local theaters" during World War II and raised funds for the City's first public library. *Id*. He helped lead a campaign to switch San Marcos from an aldermanic to a mayor-council form of government in 1949. *Id*. This information provides context for the decision to deny Plaintiffs' request to remove the Juliette balcony on the front of the "Zimmerman Home".[2]

### III.
### SUMMARY JUDGMENT STANDARD

Summary judgment is proper in any case where there is no genuine issue of material fact. Fed. R. Civ. P. 56(c); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 2552 (1986). A defendant who seeks summary judgment on a plaintiff's cause of action must demonstrate the absence of a genuine issue of material fact by either (1) submitting summary judgment evidence that negates the existence of a material element of plaintiff's claim <u>or</u> (2) showing there is no evidence to support an essential element of plaintiff's claim. *Id. at 322-25*. The party opposing the motion must then come forward with affirmative evidence to defeat it. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 257 (1986). Conclusory allegations, speculation and unsubstantiated assertions are not adequate to satisfy the non-movant's burden. *Douglas v. United Services Auto Association*, 79 F.3d 1415, 1429 (5th Cir. 1996).

### IV.
### ARGUMENTS AND AUTHORITIES

**A.    The Fifth Circuit's dicta in the remand opinion is not controlling.**

---

[2] As the Historic Resources Survey Report cited in Plaintiffs' motion for summary judgment describes the house. *See Exhibit A,* Excerpts from Historic Resources Survey Report, which identifies the home of "medium" priority.

As a preliminary matter, because Plaintiffs have raised this issue in their own summary judgment motion, the Fifth Circuit's opinion on remand, based on a Rule 12(b) standard, does not bind this Court. *United Farmers Agents Ass'n, Inc. v. Farmers Ins. Exch.*, 892 F.Supp. 890 (W.D. Tex. 1995), *aff'd*, 89 F.3d 233 (5th Cir. 1996)(ruling on Rule 12(b)(6) motion "does not bind the Court when confronted with different requests for relief and different evidentiary standards at a later stage of the litigation"); *see also Boehner v. McDermott*, 332 F.Supp.2d 149, 155 (D.D.C. 2004), *aff'd*, 441 F.3d 1010 (D.C. Cir. 2006).

Motions for summary judgment and motions to dismiss "differ in procedure as well as substance." *Ndudzi v. Castro*, 2020 WL 3317107, at *10 (W.D. Tex. June 18, 2020). A motion to dismiss is decided based on the sufficiency of the complaint and is denied if the complaint states a plausible claim, even if recovery is improbable, remote, or unlikely. *Fuller v. CIG Fin., LLC*, 29023 WL 8850756, at *2 (N.D. Tex. Dec. 21, 2023), *aff'd sub nom. Fuller v. CIG Fin., LLC*, 2025 WL 570092 5th Cir. Feb. 21, 2025). A summary judgment, however, is not confined to the allegations of the complaint, but can be based on evidence or the absence of evidence. *Id*.

The "law of the case" doctrine likewise does not apply. In the Fifth Circuit the "law of the case" doctrine "is a rule of convenience designed to prevent unnecessary reconsideration of previously decided issues." *Zarnow v. City of Wichita Falls, Tex.*, 614 F.3d 161, 171 (5th Cir. 2010). But the rule "yields to adequate reason." *Id.* (finding the district court did not violate law of the case doctrine by granting city's summary judgment motion on remand); *see also Loumar, Inc. v. Smith*, 698 F.2d 759, 762 (5th Cir. 1983) (doctrine is not a barrier to correction of judicial error, but a rule of convenience); *Seiferth v. Camus*, 377 F.App'x 417, 421 (5th Cir. 2010) (because Court of Appeals "never even reached the merits of the case" in deciding an issue based on personal jurisdiction, law of the case argument was "without merit" in regard to summary judgment).

The Fifth Circuit's opinion was issued in the motion to dismiss context in which the Court accepted all of Plaintiffs' allegations and claims, and it found that they had stated a plausible claim for relief, however remote or unlikely. No evidence was considered. The opinion does not bar this Court from considering the evidence and performing an analysis of the decisions cited in the Fifth Circuit's opinion and the additional arguments and authorities cited below. To the extent the opinion included commentary that went beyond the dismissal inquiry, such dicta would not be binding at this point.

**B.    Neither the ordinance nor removal request denial were *per se* takings under the U.S. Constitution.**

**1.    The Fifth Circuit's comment on *Loretto* is not controlling.**

While the prior Fifth Circuit panel did express that there was no material distinction between the facts in *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419 (1982) and "the allegations in the Plaintiffs' complaint", this dicta is not conclusive.[3]

The Fifth Circuit considered whether Plaintiffs stated sufficient allegations in their Complaint to survive dismissal at the pleadings stage. As noted above, the standards applicable to a motion to dismiss are wholly different in both form and substance to the standards applicable in the summary judgment phase. Although the Fifth Circuit panel indicated that it found no meaningful distinctions in the **allegations** in Plaintiffs' Complaint and *Loretto* (emphasis added), that was a decision based on the pleadings and accepted all factual allegations in the Complaint as true. However, there are factual evidentiary distinctions between this case and the facts of *Loretto* that were not discussed or fully briefed in the Motion to Dismiss context, which render *Loretto* wholly inapplicable.

**2.    *Loretto* does not apply to the facts of this case.**

There are meaningful distinctions between the summary judgment record presented in this case and the facts in *Loretto*. These most significantly include: 1) when the state action occurred versus

---

[3] This discussion in the opinion was not necessary to the final decision issued and is an issue that the City of San Marcos will continue to contest. The ramifications of such a finding were not explored before the 5th Circuit and were not contested at that time due to the case's procedural posture and the court's other findings.

when the property was acquired; 2) when the property owner learned of the intrusion versus when the overall property was acquired; and 3) the distinction between the existence of an external invasion, not just a regulatory impact on modification.

In *Loretto*, the regulation complained of was enacted <u>after</u> the plaintiff purchased the property. *See Loretto*, 458 U.S. at 421, 423 (property was purchased in 1971, but the challenged regulation was effective January 1, 1973); *see also Radenhausen v. U.S. Coast Guard*, 2014 WL 12629932, at *5 (M.D. Fa. Feb. 13, 2014) (distinguishing *Loretto* on analysis of standing based on the fact that the enactment of the state law occurred after the new owner acquired the property); *Oct. Twenty-Four, Inc.*, 107 F.3d at 3, *citing Loretto*, 458 U.S. at 424 (noting the *Loretto* Court "entertained the plaintiff's takings claim only 'insofar as it relied' on a **post-purchase** regulation") (emphasis added).

Unlike *Loretto*, the Ordinance at issue here was in place prior to Plaintiffs' purchase of the house and Plaintiffs knew they were purchasing a house in the Historic District subject to restrictions with respect to use and alteration. It is disingenuous of Plaintiffs to have purchased the property knowing it was subject to additional regulatory restrictions, and which were part of the bargained-for purchase price, and then to complain of and seek compensation for the known regulation's impact on their use of the property. In such a scenario, *Loretto* is inapplicable. *See, e.g., AM. Cont'l Corp. v. U.S.*, 22 Cl. Ct. 692, 700 (1991) (distinguishing *Loretto* since plaintiff property owners could not have had any expectations with regard to unfettered ability to possess, use, and dispose of their property when they knew it was in a historic area subject to restrictions when they purchased it).

Additionally, the plaintiff in *Loretto* was not aware of the existence of the cable box until after she purchased the building. *Id*. at 423. In this matter, there is no dispute that Plaintiffs were aware of the existence of the Juliette balcony and the attached "Z" when they purchased the property.

Most significantly, the conduct at issue in this case is significantly distinguishable from the conduct at issue in *Loretto* as it did not involve a stranger's physical imposition on Plaintiffs' real

property. As described in *Loretto*, an owner suffers injury "when a *stranger* directly invades and occupies the owner's property."  458 U.S. at 436 (emphasis in original). The Supreme Court made this clear in a subsequent decision in which it noted that *Loretto* precluded the government allowing "an interloper with a government license" on a person's property and reiterating that its *Loretto* decision was "very narrow." *F.C.C. v. Fla. Power Corp.*, 480 U.S. 245, 252-53 (1987).

The Supreme Court explicitly stated in *Loretto* that its opinion was "very narrow."  *Loretto*, 458 U.S. at 441. The Court expressly recognized that the interpretation of physical taking did not preclude the government's power to enact building codes regarding installation of various features, specifically referring to "mailboxes, smoke detectors, fire extinguishers, and the like."  *Id*. at 440.  It further noted that its decision would be considering a "different question" if the plaintiff was simply required to install the equipment herself because the landlord would then "own the installation" instead of a third-party company.  *Loretto*, 458 U.S. at 440-41, n. 19.

Numerous decisions have similarly concluded that a restriction on removal or required placement of an object on property is not automatically a *per se* physical taking under *Loretto*. These are cited at length in Defendants' Response to Plaintiffs' First Amended Summary Judgment Motion [*see* Doc. 38-1, p.14-18, incorporated herein by reference], and are somewhat more briefly recounted herein. *See, e.g.,* all specifically referencing the requirement of a third-party physical invasion: *Cablevision Sys. Cor. v. F.C.C.*, 570 F.3d 83, 98 (2nd Cir. 2009); *Qwest Corp. v. U.S.*, 48 Fed. Cl. 672, 690 (2001); *Flamingo Paradise Gaming, LLC v. Chanos*, 217 P.3d 546, 561 (Nev. 2009).

As noted in *Wilkins v. Daniels*, laws requiring microchips in animals, warning labels on packaging, lighting on boats, handrails in apartment buildings, ramps leading to restaurants, or license plates on vehicles are assessed under the frame-work for alleged regulatory takings; none were considered a government-authorized occupation of property by a third party, as "neither the government nor a third party has occupied [plaintiffs] property". 744 F.3d 409, 419 (6th Cir. 2014).

More similar to this matter, in *Collins v. Historic Dist. Comm'n of Carver*, 897 N.E. 2d 1281 (Mass. 2008), the plaintiffs sued when they were denied permission to build a home on property in a historic district. The Massachusetts Supreme Court concluded there was no *per se* claim under *Loretto*, nor could there be, as there was no showing that the town had authorized a permanent physical occupation, despite its refusal to allow the plaintiffs to alter or renovate their property. *Id*. at 1285.

The same result was reached in *Prominence Homes & Communities, LLC v. City of Orange Beach, Ala.*, 20022 WL 22845071 (S.D. Ala. Oct. 27, 2022), when the plaintiff was prevented by a tree ordinance from removing a tree that planted by a prior owner. The court concluded there was no physical taking: there was no physical intrusion on the property and there was no physical appropriation of property. *Id*. at \*10-11; *see also Bldg. Owners & Managers Ass'n Int'l v. F.C.C.*, 254 F.3d 89, 97-98 (D.C. Cir. 2001) (upholding fire suppression sprinkler system requirements).[4]

Likewise, in *Keystone Bituminous Coal Ass'n v. DeBenedictis*, 480 U.S. 470 (1987), the Supreme Court concluded that restricting property owner's removal of coal from the property was not a physical taking, in the same way that a setback ordinance was not one. *Id*. at 497-498.[5]

*Loretto* is inapplicable to this matter. The *Loretto* decision involved a post-purchase regulation of the owner's property involving a third party's placement of a cable box that the owner did not know existed when she purchased the property and that she did not have ownership or control over.  The case involved a government mandate that the plaintiff be required to permit a third party to enter her property and install a foreign object which it would continue to own.

---

[4] *See also, F.P. Dev., LLC v. Charter Twp. of Canton*, 456 F.Supp.3d 879, 884 (E.D. Mich. 2020), *aff'd sub no. F.P. Dev., LLC v. Charter Twp. of Canton, Michigan*, 16 F.4th 198 (6th Cir. 2021) (another tree removal denial found to not constitute a physical taking).

[5] *See also*, *Mayhew v. Town of Sunnyvale*, 964 S.W.2d 922, 933 (Tex. 1998) (no physical taking of property where there was no physical occupation; denial of planned development was regulatory claim); *2218 Bryan St., Ltd. v. City of Dallas*, 175 S.W.3d 58 (Tex. App.—Dallas 2005, no pet.); *Brown v. City of Paris*, 2006 WL 8440492 (E.D. Tex. Sept. 25, 2006) (denial of COA to build chain link fence in historic district was not a "taking"); *Fox v. City of Pac. Grove, Ca.*, 2025 WL 247064, at \*3-4 (N.D. Cal. Jan. 17, 2025). *Compare, Cedar Point Nursery v. Hassid*, 594 U.S. 139, 149 (2021) (regulation was a *per se* taking because it required owner to allow third parties to enter its property).

The Commission declined Plaintiffs' request for removal of a nearly 100-year-old feature from their home to preserve the historic character of the home's façade and its history. This feature was not originally placed by the City of San Marcos nor will the City or any third party access Plaintiffs' property to utilize, maintain, or exercise control over this feature. Plaintiffs purchased the Zimmerman house, fully aware that it was located in the Historic District and had modification restrictions. Such restrictions would have been reflected in the purchase price. The balcony and "Z" were both part of the property Plaintiffs purchased, and Plaintiffs continue to own the balcony and the "Z."  There was simply no physical invasion or occupation dictated by the Ordinance or the Commission.

As demonstrated by the numerous authorities cited above, a government may restrict alterations or renovations of properties subject to historic preservation or zoning ordinances without there being a physical taking under *Loretto*. To carry Plaintiffs' argument to its logical conclusion would render nearly all ordinances impacting real property a physical taking.  *See Fox.*, 2025 WL 247064, at *3 (to construe "the city's protected tree ordinance as a *per se* physical taking would elevate countless land-use restrictions to *per se* takings"); *see also Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 323-24 (2002) ("Land-use regulations are ubiquitous and most of them impact property values in some tangential way….  Treating them all as *per se* takings would transform government regulation into a luxury few governments could afford").

Governmental regulations requiring setbacks, limits on height or building sizes, requirements regarding trees and tree preservation, smoke detectors, fire extinguishers, or other safety matters, and any environmental restrictions on properties, would be a *per se* physical taking under Plaintiffs' broad interpretation of *Loretto*. However, both the state and federal courts have repeatedly and consistently rejected such arguments; these are regulatory takings that are authorized under certain circumstances – like the circumstances in this case. This was not a *Loretto*-type physical taking as a matter of law. The

evidence conclusively establishes to the contrary. As a result, Defendants are entitled to summary judgment on Plaintiffs' federal *per se* takings claim.

### 3.    The Ordinance is constitutional as a matter of law.

Plaintiffs allege that the Ordinance is a *per se* taking.[6] Plaintiffs have never identified any particular aspect of the ordinance that allegedly constitutes a *per se* taking but instead seem to have argued that the Ordinance, as a whole, violates the United States Constitution.

Regulatory restriction of the use of property is a primary means available to a State to protect the public welfare. *Keystone Bituminous Coal Ass'n*, 480 U.S. at 489-91. This includes recognition of a constitutional power to regulate the use of private property in the interest of historic preservation. *Mayes v. City of Dallas*, 747 F.2d 323, 324 (5th Cir. 1984); *see also Powell v. City of Houston*, 628 S.W.3d 838, 847 (Tex. 2021) (noting with approval that for "decades" "states and cities took on the new task of preserving buildings with history and aesthetics that impacted the local environment in a different way" and that "historic preservation ordinances focus on the architectural details that communicate a building's significance and its connection to a neighborhood").

The preservation of historic structures is a legitimate and constitutional goal of government. *Penn Central Transp. Co. v. City of New York*, 438 U.S. 104, 129 (1978). *Penn Central* also involved the constitutionality of a regulation that restricted exterior alterations of a building. *Id*. The Court ruled the regulation was not a taking, even when though it significantly impaired the owners' expectations. *Id*. Courts have long upheld as constitutional city ordinances that require a homeowner to ensure that changes to his or her historic property are compatible with and conform to neighboring properties. *See, e.g., Stevens v. City of Columbus, Ohio*, 2020 WL 3792210, at *7 (S.D. Ohio July 7, 2020), *aff'd*, 2022 WL 2966396 (6th Cir. July 27, 2022), *citing Mayes*, 747 F.2d at 325 and *Boczar v. Kingen*, 6 F. App'x

---

[6] Plaintiffs have argued that they are not claiming the Ordinance itself is unconstitutional, but only when read together with the other regulations at issue; but they do argue any are unconstitutional on their face. Plaintiffs cannot stitch together different elements of different statutes, rules, and regulations, then argue that they are all unconstitutional when combined into one massive regulation. Plaintiffs do not cite to a single authority for such a proposition.

471, 476 (7th Cir. 2001); *see also Maher v. City of New Orleans*, 516 F.2d 1051, 1059-60 (5th Cir. 1975)(noting the "substantial support" for legislative determination to preserve historic landmarks and districts"). Historic preservation has long qualified as a significant governmental interest.  *See Knights of Columbus, Council No. 94 v. Lexington*, 272 F.3d 25, 32 (1st Cir. 2001).

**C.      As a matter of law, there was no violation of the Texas Constitution.**

**1.      The Ordinance is not based solely on aesthetics.**

Plaintiffs claim that because the Ordinance considers aesthetics, that it is unconstitutional.[7] Plaintiffs have provided no definition of "aesthetic" that would apply to this matter but have repeatedly used the word as some sort of talismanic, catch-all term, interchangeable with "visible."[8] But, the plain language of the Ordinance reflects that it is not governed by purely aesthetic considerations. The Ordinance requires that new construction and modifications be compatible with the neighborhood's historical, architectural and/or cultural character; that is not a "merely" aesthetic requirement.  SAN MARCOS DEV. CODE § 2.5.5.1(A). *See also, Exhibit B* and Doc. 37, p.90. [9]

As noted by the Texas Supreme Court, "city ordinances are presumed to be valid, and courts have no authority to interfere unless the ordinance is unreasonable and arbitrary—a clear abuse of discretion." *Powell v. City of Houston*, 628 S.W.3d 838, 842 (Tex. 2021), *Id*. at 842 (further noting "the burden is a heavy one").  In *Powell*, an ordinance set out eleven separate findings with regard to

---

[7] Plaintiffs have relied in part on *Lombardo v. City of Dallas*, 73 S.W.2d 475 (Tex. 1934).  However, the Supreme Court of Texas never actually stated that purely aesthetic considerations are invalid in that decision.  Rather, the Court was quoting at length from a Texas Jurisprudence article.  *Id*. at 478-79.  The Court quoted from several other sources before ultimately reaching a decision in the matter that was unrelated to aesthetics.  *Id*., 479-81.

[8] Plaintiffs seem to equate "visible" with "aesthetic," without any authority for the same. The regulations have numerous conditions, considerations, and areas to consider, and mention aesthetics only once. *See Exhibit B and Doc. 37, p.90-91.* Use of vague terms like "pizazz" or "pretty" during various Commission meetings does not render every Commission decision an aesthetic-only decision. "Visible" is not a synonym for "aesthetics." Historic preservation regulations that have repeatedly been approved by the courts clearly have and can consider visual issues to preserve the architectural, cultural, and historic nature of a district—which includes how it looks. These legitimate governmental goals could not be achieved if every determination had to be made without regard to any visual consideration.

[9] While the Fifth Circuit concluded the *Spann* and *Lombardo* opinions regarding pure aesthetics are still good law, but the Fifth Circuit also recognized the various criteria used by the Commission were not based purely on aesthetics.  *Money*, 2025 WL 429980, at *1.

changes to exterior features of an existing structure in a historic district. *Id*. at 858. The Supreme Court did not reject or challenge the scope of that ordinance at issue. *Id*. at 859; *see also City of Dallas v. Crownrich*, 506 S.W.2d 654, 658 (Tex. Civ. App.—Dallas 1974, writ ref'd n.r.e.) (concluding a city "would be entitled under its zoning authority to zone a particular area as a historic district"). The San Marcos ordinance sets out similar provisions for consideration. *Compare* HOUSTON CODE OF ORDINANCES § 33-241(1)-(11) (using the same "visually compatible" terminology) *with* Doc. 37, pp.62 and 87, SAN MARCOS DEV. CODE § 2.5.5.1(A), § 4.5.2.1(A), and § 4.5.2.1(I)(1)(a)-(j).

Moreover, as set forth above, those were not the only considerations the Commission is required to consider; they also include the educational and economic welfare of the public and of the City, as well as the economic welfare of the community, and it relies on the Secretary of the Interior's Standards for Rehabilitation. *Id*., § 4.5.2.1(A), 4.5.2.1(I)(2); *see also* 36 C.F.R. § 67.7(b). The Secretary's Standards for Rehabilitation include:

> 2. The historic character of a property shall be retained and preserved. The removal of historic materials or alteration of features and spaces that characterize a property shall be avoided.
>
> 3. Each property shall be recognized as a physical record of its time, place, and use. Changes that create a false sense of historical development, such as adding conjectural features or architectural elements from other buildings, shall not be undertaken.
>
> 4. Most properties change over time; those changes that have acquired historic significance in their own right shall be retained and preserved.
>
> 5. Distinctive features, finishes, and construction techniques or examples of craftsmanship that characterize a historic property shall be preserved.

36 C.F.R. § 67.7(b). These standards do not turn "solely" on aesthetic considerations.

As even the Fifth Circuit acknowledged, a zoning ordinance that includes aesthetic objectives is not always unconstitutional. *Money v. City of San Marcos*, 2025 WL 429980, at *6 (5th Cir. Feb. 7, 025), *citing Connor v. City of University Park*, 142 S.W.2d 706, 713 (Tex. App.—Dallas 1940, writ ref'd); *see also Mira Mar Dev. Corp. v. City of Coppell, Tex*., 421 S.W.3d 74, 91 (Tex. App.—Dallas

2013, no pet.) ("Maintaining aesthetic values is a legitimate government interest" and concluding that the city's placement of columns and landscaping on plaintiff's property were proportional to the impact, necessitating affirmance of the denial of plaintiff's summary judgment).

Plaintiffs' claim that the goal of protecting history is disingenuous because the Ordinance only addresses exterior forward facing features actually supports, rather than undermines, the City of San Marcos position. The Ordinance limits its reach to accomplishing its identified goals. The purpose of the Ordinance is to create and preserve a visible reminder in the neighborhood (the "Historical District") of the community's historical and cultural heritage:

> **A.   Purpose.** The purpose of HD, Historic District is to promote the educational, cultural and economic welfare of the public and of the City by preserving, conserving, and protecting Historic Structures, Streets and neighborhoods that serve as visible reminders of the history and cultural heritage of the City, the State and the United States. Furthermore, it is the purpose of

The fact that the ordinance attempts to limit the impact on homeowners by restricting its scope to visible elements of the property does not support Plaintiffs' claim. It shows that the City used the least restrictive means available to protect the historical character, design, and architecture.[10]

Texas Local Government Code Section 211.003 provides that "in the case of designated places and areas of historical, cultural, or architectural importance and significance, the governing body of a municipality may regulate the construction, reconstruction, alteration, or razing of buildings and other structures." TEX. LOC. GOVT CODE ANN. § 211.003(b). The San Marcos Development Code ordinance complies with and is intended to "preserve and maintain the character of the historic buildings in San Marcos." [Doc. 37, Plaintiffs' Exhibit 1, p.87]. The Ordinance does not turn purely on aesthetics; its

---

[10] Plaintiffs have argued that the ordinance is applied "with equal force" to newer homes and vacant lots. [Doc. 33]. This would merely show that the ordinance is applied evenly and consistently to all properties located within the Historic District in order to protect the character of the neighborhood – exactly what the ordinance indicates that it is intended to do.

language expressly demonstrates to the contrary. Accordingly, Plaintiffs' claim of violation of the

Texas Constitution fails as a matter of law.

### 2.    Application of the Ordinance was not based solely on aesthetics.

The video recording of the hearing in this matter further makes it abundantly clear that the

Commission considered the historic nature of the balcony in reaching its decision—it did not make a

decision based purely on aesthetics. Doc. 12-2 at 2:10-23.

> **Commissioner 1:** "Just looking at the images and so forth, it strikes me as being original to the house and really seems like a character-defining element of the house. It's like one of the – it seems to really define the historic quality of the façade, to me."

*Id.* at 6:03-20.

> **Commissioner 2:** "I agree. I think it is very important historically because it's got the Z on it and it was the Zimmerman house. And the reason that we have houses in the historic district is we're trying to make a connection in some ways to the past. And just to go in and destroy the one thing that really points it out as being the Zimmerman house seems like it would be a shame to take that off and I don't know why you'd want to take that off, because it certainly helps define the house. It helps define the history."

*Id.* at 6:25-7.

A third commissioner then asked Ms. Money directly why she wanted to remove the balcony:

> **Money:** "Um, well, you know, every person is different. We just – we don't like it. We don't want it on. I think our application, um, speaks for itself."

*Id.* at 7:23-36.

> **Commissioner 2:** "But if everybody did that in historic districts – if everybody did what they wanted and what they liked, then the historic district would have no integrity. It wouldn't even be historic anymore."

*Id.* at 7:40-50.

> **Money:** "I understand where you're coming from. Yeah. It's integrity, that ideal that propels us to want things to be similar to our family's values. So I can see that we share the same value of integrity, it's just a matter of application."

*Id.* at 7:52-8:12.

> **Commissioner 1:** "I mean, that's the whole point of a historic district, is to retain character-defining features, and that is a character-defining feature. Certainly it appears to date from the '30s just from what I can tell as an architectural historian. And it doesn't seem to cause any problems. It's relatively minor in the sense of, you know, functionally, it's not hurting anything. I can't see how it could hurt anything. So I don't really see a justification for removing it, given the fact that the house is in a historic district and that's a character-defining feature of the house."

*Id.* at 8:15-55.

> **Commissioner 2:** "You know, so many of us who restore these houses struggle to keep the original character-defining aspects of the house and the materials that are originally used and all, and that's the whole point of being in a historic district, you know, to kind of like respect the past."

*Id.* at 8:58- 9:19; *see also* Doc. 19, P. 15.

The Commissioners' discussion expressly demonstrates that their intent and concerns were consistent with the express goals of the Ordinance: to preserve neighborhood historical character.

**3.    There is a presumption of ordinance validity.**

"A city is not required to make compensation for losses occasioned by the proper and reasonable exercise of its police power." *City of Coll. Station v. Turtle Rock Corp.*, 680 S.W.2d 802, 804 (Tex. 1984). The regulation must be adopted to accomplish a legitimate goal and be substantially related to the health, safety, or general welfare of the people. *Id*. at 805. The concept of the general welfare has a broad range." *Id*. Further, to be reasonable; it cannot be arbitrary. *Id*.

There is a presumption that favors the reasonableness and validity of the ordinance. *Id*. An "extraordinary burden" rests on one attacking a city ordinance. *Id*.; *see also City of Pharr v. Tippit*, 616 S.W.2d 173, 176 (Tex. 1981) ("The burden on the party attacking the municipal legislative action is a heavy one"). The burden of showing that the ordinance is unnecessary, unreasonable and arbitrary is on the plaintiff and unless that showing is clearly made, the action of the City is conclusive and cannot be revised by the courts. *City of San Antonio v. Pigeonhole Parking of Tex., Inc.*, 158 Tex. 318, 326, 311 S.W.2d 218, 223 (1958) (ordinance was not invalid, even though it placed restrictions on garage owner in the use of its property).

In this matter, the Legislature has charged the City with preserving the historical, architectural, and cultural features of its community, and both the Supreme Court of Texas and the Fifth Circuit have approved of such regulations. The ordinance is substantially and rationally related to a legitimate goal for the general welfare of the people. There is no evidence that the ordinance or its application were unnecessary, unreasonable or arbitrary such that Plaintiffs can overcome the presumption of validity. Accordingly, the undisputed summary judgment evidence establishes the City's legitimate

governmental interest in preserving the character and integrity of the historic district necessitates dismissal of Plaintiffs' cause of action based on the Texas Constitution.

### 4.    The Ordinance as applied was not unduly burdensome.

Plaintiffs did not allege that the Ordinance was unduly burdensome in their Complaint and they have no evidence that it was. The purpose of the Ordinance is to preserve the historical, architectural or cultural visual character of these historic neighborhoods. It expressly provides a procedure for homeowners to follow when they want take action that implicates the ordinance, and the ordinance provides guidance to the Commissioners and homeowners about factors to consider when reviewing these requests. Plaintiffs have not offered any evidence that they were or are unduly burdened, particularly when the primary basis they currently urge for the burden placed on them – having to maintain the "Z" on their home, is not a basis that was provided to the Commission or the City. Plaintiffs cannot argue that the City failed to properly weigh the burden versus governmental interest by presenting evidence of a burden that was not timely presented to the government entity.

### D.    Plaintiffs have waived any regulatory takings claim.

To the extent Plaintiffs may argue that their claim falls under the regulatory takings analysis of *Penn Central*, Plaintiffs have made no such claim.  In fact, Fifth Circuit expressly noted in its opinion on remand that "[t]he Moneys do not assert a regulatory takings claim, so the only question is whether they stated a *per se* takings claim." *Money v. City of San Marcos*, 2025 WL 429980, at *4 (5th Cir. Feb. 7, 2025).

Because Plaintiffs have not asserted a regulatory takings claim, they have waived any such claim.  *See McCutchen v. U.S.*, 145 Fed. CL. 42, 5 (2019), *aff'd*, 14 F.4th 1355 (Fed. Cir. 2021) (plaintiffs did not assert a regulatory taking claim under *Penn Central*, and any argument based on *Penn Central* "has therefore been waived"); *Midas Res., Inc. v. U.S.*, 168 Fed. Col. 385, 403 (2023) (plaintiff failed to state a physical *per se* taking claim and did not allege a regulatory takings claim,

thereby waiving the issue).  Plaintiffs have expressly plead and pursued only a physical *Loretto per se* takings claim; they cannot now assert a regulatory takings claim.

## V.
## CONCLUSION AND PRAYER

Defendants are entitled to summary judgment. The *Loretto* opinion is "very narrow" and does not apply when there is no physical invasion by a third party with ownership of an object left on Plaintiffs' property.  Plaintiffs own the entire house, including the balcony and "Z".  To rule otherwise would invalidate nearly all land use regulations, a reversal of extensive and well-established decisions that have uniformly rejected assessment of these regulations as physical takings. Defendants are also entitled to summary judgment under the Texas Constitution, since neither the Ordinance nor its application were based on pure aesthetics, and there is no evidence that either the Ordinance or its application to Plaintiffs is unduly burdensome. The Ordinance and its application serve a legitimate governmental interest in the least restrictive means possible, outweighing any purported burden.

WHEREFORE, PREMISES CONSIDERED, Defendants City of San Marcos and Amanda Hernandez, Director of Planning and Development in her official capacity, respectfully pray this Court grants their Motion for Summary Judgment, and for such and further relief to which they may be justly entitled.

Respectfully submitted,

**FLETCHER, FARLEY, SHIPMAN & SALINAS, L.L.P.**
2530 Walsh Tarlton Lane, Suite 150
Austin, Texas  78746
(512) 476-5300
FAX (512) 476-5771

By:  /s/Joanna Lippman Salinas
Joanna Lippman Salinas
Texas State Bar No. 00791122
joanna.salinas@fletcherfarley.com

Attorneys for Defendants, *City of San Marcos and Amanda Hernandez, Director of Planning and Development Services in her official capacity*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing **Motion for Summary Judgment** has been provided to the following, in accordance with the Federal Rules of Civil Procedure, on October 27, 2025.

Robert Henneke
Chance Weldon
Christian Townsend
TEXAS PUBLIC POLICY FOUNDATION
901 Congress Avenue
Austin, Texas 78701

/s/Joanna Lippman Salinas
Joanna Lippman Salinas